**Affirmed and Majority and Dissenting Opinions filed June 6, 2019.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-17-00259-CR

---

### ROBERT RAY MOORE, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the 184th District Court
Harris County, Texas
Trial Court Cause No. 1489433**

---

### O P I N I O N

In this ineffective-assistance-of-counsel appeal following the denial of a motion for new trial, appellant Robert Ray Moore asserts that his trial counsel rendered ineffective assistance by (1) failing to investigate appellant's intellectual capacity, (2) not pursuing a competency examination, (3) failing to communicate with appellant about the "guilty" plea in a way appellant could understand and giving misleading advice about appellant's chances of probation, (4) failing to put on mitigating evidence at the punishment hearing, and (5) failing to inform, advise,

and prepare appellant with respect to his testimony at the punishment hearing.  We affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Appellant was charged with assaulting his common-law wife, the complainant, by impeding her breathing.  A criminal proceeding ensued, culminating in appellant's "guilty" plea and an eight-year prison sentence.

### *Plea and Sentencing Hearing*

Appellant waived his right to a jury trial and pleaded "guilty" without a plea bargain or recommended sentence from the State.  Five months later, after a presentence investigation ("PSI") report, the trial court held a punishment hearing at which appellant's counsel urged the court to order probation so that appellant could seek therapy.  The complainant and other supporters endorsed the request.  The State advocated for prison time, relying on appellant's past assaults of the complainant and evidence that appellant violated bond conditions first revealed during the complainant's testimony at the punishment hearing.

The trial court admitted without objection the PSI report offered by the State and three character-reference letters offered by appellant.  The State called the complainant, who testified as follows:

> Q. [C]an you tell me what -- tell the Judge what you told me about why you came here today? What do you think should happen in this case?
>
> A. I came here today to testify for [appellant] just to let you-all know that I don't think he deserves to go to jail, any jail time. Because I have been knowing [appellant] since I was a teenager, and he -- I believe that he just needs some guidance, some help. He is not a bad person. He takes -- he takes care of all five of my children. I'm currently unemployed right now, so that leaves him the responsibility financially to take care of the kids, and I'm depending on him. I have

been depending on him to take care of them. He is a very good dad. He helps out with the kids a lot, and I just believe that he needs a little guidance. Because he is not a bad person at all. Robert is not a bad person. He is a very -- he is a very good guy.

During her testimony, the complainant revealed that she recently had resumed regular contact with appellant and that they were "on the same page with the co-parenting" of their five children. In testifying, she acknowledged appellant's past bad conduct but stated that she had noticed that appellant's behavior and habits have changed dramatically, that "he is growing up."

The PSI report contained information about appellant's troubled social history, indicating that despite a good relationship with both of his parents, growing up he often was unhappy because he was in trouble frequently. Corporal punishment was the usual form of disipline in his household. The PSI report states that his parents had abused alcohol and had been on welfare, that he had trouble with schoolwork, "was assigned to special education classes all through school," and that he wished his parents had pushed him more in school. The report indicates that appellant had sporadic employment and problems finding a stable job because he is illiterate. The report also contains information about appellant's criminal history, including the following:

On January 26, 2011, [appellant] attempted to gain entry to the complainant's apartment by kicking in her front door. When his attempts were unsuccessful he attempted to gain entry through a locked window.

On February 20, 2011, [appellant], while a passenger in an automobile, pointed a gun at Houston Police officers as they drove past him. [Appellant] was arrested and pled guilty to a lesser offense.

On July 24, 2012, [appellant] was convicted of family violence assault.

On November 23, 2012, [appellant] was convicted of assaulting the complainant.

On May 17, 2013, [appellant] was in a vehicle with the complainant, who was pregnant, and one of her children. They got into an argument and [appellant] began to drive erratically and dangerously. The [appellant] stopped the car, dragged the complainant out of the car onto the ground where he assaulted her.

On November 24, 2014, [appellant] called the complainant multiple times before showing up at her grandmother's house and banging on her door. [Appellant] left, but not before he turned off the power to her grandmother's house. [Appellant] then called and threatened to kill the complainant if she called the police. During his call, [appellant] told the complainant she and her children were going to "sweat tonight."

On March 31, 2015, [appellant] used [the complainant's] car and took her to work. When he arrived to pick her up, he was aggressive and angry. [Appellant] then pushed the complainant to the ground, cursed at her and threatened to get a gun and shoot her brother.

On April 4, 2015, [appellant's] sister reported she feared for her safety because she was afraid [appellant] was going to turn off her breaker box and set her house on fire.

The charged offense at issue in this appeal occurred on November 15, 2015. Among eight instances of criminal conduct described in the PSI report, the State asked the complainant about only appellant's two prior assault convictions, for which she was the complainant. In addition to discussing these episodes the complainant also testified about the circumstances of the assault at issue. According to the complainant, shortly before the assault, appellant's father died, and appellant had been drinking heavily as a result. She stated that appellant had "blacked out," and that it appeared to her that he did not know what he was doing until the incident was over. She testified that appellant started crying and left with their son, who had witnessed the assault.

After the State rested, appellant called his longtime friend Dedrick Nash, who testified that he had spent significant time around appellant and appellant's children in the six or seven months leading up to trial and noted appellant's

4

involvement in positive activities.

Appellant testified about his mental health and his desire to seek anger management treatment. At the close of the hearing, the trial court assessed punishment at eight years' confinement. Speaking to the complainant, the judge simply stated, "I really – I'm concerned ma'am, that he is going to really hurt you."

*Motion for New Trial*

Appellant retained new counsel and moved for a new trial, arguing his "guilty" plea was involuntary and unknowing due to his intellectual disability and the ineffective assistance of his prior counsel.

Appellant's former counsel testified at the motion-for-new-trial hearing, stating:

- Counsel first learned of appellant's illiteracy during the sentencing hearing, and had he known this information he would not have recommended a "guilty" plea before first seeking a competency evaluation.

- Appellant's mother had told counsel that appellant had been in special classes, that counsel knew appellant "was slow," "just not how slow," and that appellant's mental health was the subject of an investigation that petered out after appellant's mother and the complainant advised appellant the records were not recoverable.

- Counsel would have handled aspects of the representation differently had he known that appellant was illiterate.

Appellant also offered, without objection, the affidavit of Rebecca Hamlin, Ph.D., PC, who attached her psychological evaluation report. The report contained the results of her testing, her diagnoses, and her opinions expressed through her retrospective assessment of factors affecting appellant's ability to participate

5

during his trial. In the report Dr. Hamlin notes appellant's IQ score of 61, which "would place [appellant] in the extremely low range of intellectual functioning." Dr. Hamlin also notes that appellant's overall level of functioning was "adequate to engage counsel in a reasonable and rational manner[,]" but that [appellant's] limited verbal abilities "would necessitate assistance with any written materials, simplified explanations, and frequent checks for clarity."

Appellant also filed a five-sentence affidavit in which he stated:

I trusted my lawyer.

My lawyer told me to plead guilty.

He said I would get probation.

He never told me I would have to take the stand.

Now I wish I did not plead guilty.

At the conclusion of the hearing, the trial court denied the motion for new trial.

## II. ISSUES AND ANALYSIS

Appellant asserts that he was denied his right to effective assistance of counsel. Both the United States Constitution and the Texas Constitution guarantee an accused the right to assistance of counsel. U.S. Const. amend. VI; Tex. Const. art. I, § 10; Tex. Code Crim. Proc. art. 1.051 (West, Westlaw through 2017 1st C.S.). This right necessarily includes the right to reasonably effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984); *Ex parte Gonzales*, 945 S.W.2d 830, 835 (Tex. Crim. App. 1997). To prove ineffective assistance of counsel, appellant must show that (1) trial counsel's representation fell below an objective standard of reasonableness, based on prevailing professional norms; and (2) there is a reasonable probability that the result of the proceeding would have been different but for trial counsel's deficient performance. *Strickland,* 466 U.S. at 688–92. To have a court set aside a

defendant's "guilty" plea as involuntary based on the deficient performance of defendant's trial counsel in advising the defendant regarding the "guilty" plea, the defendant must prove a reasonable probability that, but for trial counsel's deficient performance, the defendant would not have pleaded "guilty." *See Lee v. U.S.*, — U.S.—,—, 137 S.Ct. 1958, 1965, 198 L.Ed.2d 476 (2017); *Miller v. State*, 548 S.W.3d 497, 499–500 (Tex. Crim. App. 2018). The appellant bears the burden of proving ineffective assistance of counsel by a preponderance of the evidence. *Jackson v. State,* 973 S.W.2d 954, 956 (Tex. Crim. App. 1998).

A reasonable probability is one sufficient to undermine confidence in the outcome. *Cox v. State*, 389 S.W.3d 817, 819 (Tex. Crim. App. 2012). In determining whether an appellant has been prejudiced by counsel's deficient performance, the court "must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695. But, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696.

An appellate court reviews a trial court's denial of a motion for new trial for an abuse of discretion, reversing only if no reasonable view of the record could support the trial court's ruling. *Burch v. State*, 541 S.W.3d 816, 820 (Tex. Crim. App. 2017). This is a deferential standard of review that requires appellate courts to view the evidence in the light most favorable to the trial court's ruling. *Id*. We must presume that the trial court disbelieved evidence supporting appellant's ineffective-assistance claims. *See id*. at 821. In determining whether the trial court

abused its discretion, an appellate court must not substitute its own judgment for that of the trial court, and it must uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Id*. at 820.

**A. The trial court did not err in impliedly concluding appellant did not prove prejudice from trial counsel's failure to pursue a competency examination.**

In his second issue, appellant argues that that trial counsel was ineffective for not pursuing a competency examination in advance of appellant's pleading "guilty." We presume for purposes of analysis that appellant's counsel's decision not to request a competency examination fell below an objective standard of reasonableness (based on prevailing professional norms), and we address the second prong under *Strickland*. Under this prong, appellant must show a reasonable probability that he would have been found incompetent to stand trial if the issue of competency had been raised and fully considered. *Ex parte LaHood*, 401 S.W.3d 45, 54 (Tex. Crim. App. 2013); *see Strickland,* 466 U.S. at 695. Anything less than a finding of incompetence cannot have changed the outcome. *See Ex parte LaHood*, 401 S.W.3d at 54.

A person is presumed to be competent, and the burden rests on a criminal defendant to prove incompetency by a preponderance of the evidence. Tex. Code Crim. Proc. art. 46B.003(b) (West, Westlaw through 2017 1st C.S.); *Ex parte LaHood*, 401 S.W.3d at 54. To prove incompetency there must be some affirmative showing that the person lacked "sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding" or "a rational as well as factual understanding of the proceedings against the person." Tex. Code Crim. Proc. art. 46B.003(a). To prevail in a claim of ineffective assistance of counsel in this context, appellant must prove that but for his trial counsel's deficient performance, there is a reasonable probability that the fact-

finder would have found him incompetent to stand trial. *See Ex parte LaHood*, 401 S.W.3d at 54. In this type of analysis, courts consider the factors used by the experts in evaluating the broader question of competency, which include whether a defendant can

> (1) understand the charges against him and the potential consequences of the pending criminal proceedings; (2) disclose to counsel pertinent facts, events, and states of mind; (3) engage in a reasoned choice of legal strategies and options; (4) understand the adversarial nature of criminal proceedings; (5) exhibit appropriate courtroom behavior; and (6) testify.

*Ex parte LaHood*, 401 S.W.3d at 54. Dr. Hamilin's expert report addresses each of these factors in her interview with appellant:

> (1) Appellant stated he was charged with "assault," that he "could get probation or county time;" that his lawyer led him to understand that if he pled "guilty" he would get probation but that the judge told him there was no promise he would get probation.
>
> (2) Appellant "was able to communicate adequately if questions were restated in simple form and if there were checks for clarity."
>
> (3) Appellant "accurately described the pleas of "guilty" as "I did it" and "Not Guilty" as "I didn't do it." He indicated that he understood and provided reasons he might choose between a judge and jury trial. "When asked if he would agree with something his lawyer suggested even if he did not understand (i.e., pleading guilty to get probation), he initially stated he would not agree to something he did not understand but later affirmed that he was likely to pretend to understand things even when he did not."
>
> (4) Appellant described the defense attorney's job as "for me" and state's attorney's job as "against me." Appellant understood that trial the judge's role was to "see if he was guilty or not."
>
> (5) Appellant "displayed appropriate behavior throughout the more than three and a half-hour long evaluation process."
>
> (6) Appellant's "ability to recount past events and describe situations under stress was judged to be adequate," but "his ability to respond to complex questions was judged to be impaired and concepts had

9

to be broken down and explained several times."

Appellant demonstrated during the sentencing hearing that he could testify, giving details about facts, events, and his state of mind, specifically about his mental health. He recalled, among other things, the names of medications that he took while in high school; that he stopped taking those medications after the tenth grade when he left high school; and he explained that he was a slow learner.

The record also provides some evidence that appellant engaged in a reasoned choice of strategies and options. *See Ex parte LaHood*, 401 S.W.3d 45, 55 (Tex. Crim. App. 2013) (reviewing appellant's testimony that demonstrated he "engaged in a reasoned choice of legal strategies and options."). Appellant's trial counsel explained that in preparing appellant to testify, "appellant agreed to testify," and appellant "wanted to emphasize he wanted to get help for the problems that he had with anger, anger management, things of that nature." His counsel supported this strategy and prompted testimony in this manner:

> Q. Okay. Now, Mr. Moore, you understand that we're here today because we are seeing if the Court would take into consideration that you may be a candidate for probation?
>
> A. Yes, sir. Please. Yes, sir.
>
> Q. Okay. Now, do you feel that if you were able to get some help, you would be able to improve your conditions as far as your -- the -- your mind, your anger management issues that created so many problems for you in the past?
>
> A. Yes.
>
> Q. Okay. Why do you think that? Have you ever gotten any help? You haven't gotten any help?
>
> A. That's what I'm saying, I would like to get help. That's what I want.
>
> Q. Are you willing to make the sacrifices on things that you would be told to do?

A. Yes, sir. Yes, sir. Promise.

The hearing record contains evidence that appellant understood the charges against him and the potential consequences of the pending criminal proceedings. Although appellant's former counsel testified that had he known that appellant was illiterate he would have pursued a competency evaluation before appellant entered his "guilty" plea, former counsel also testified at length about his perception of appellant during his interactions with appellant before appellant entered his plea and later in preparing appellant to testify. Former counsel repeatedly stated his belief that appellant understood the nature of the charges, the plea process, and attendant consequences:

Q. All right. So you read [the plea documents] to him and he was shaking his head affirmatively that he understood?

A. That's correct. I wouldn't have moved forward if he hadn't said that.

Q. At any time did he ask you any questions?

A. No.

Q. About what you were reading to him?

A. No, he did not.

Q. Did he ever tell you that he didn't understand what you were reading to him?

A. No, he did not.[1]

Q. And did you read each of the documents word for word to him?

A. For him, I had -- yes. For him, I did. We took our time. Sometimes we rushing, but in this particular case, it wasn't a rush. We took our time.

Q. And did he understand what the procedure was going to be in terms

---

[1] During the direct examination of appellant at the punishment hearing, his counsel used the word "duration" in a question; appellant asked him what the term meant as opposed to acting like he understood the term and answering the question anyway.

of taking the plea of guilty and then having the sentencing be done at another time after a Presentence Investigation report could be completed?

A. I explained that to him, yes.

Q. And did you feel that he understood that?

A. I -- I really did. I thought he understood it. But again, we didn't interact or he didn't ask questions that -- to be specific, I just generally went over everything with him.

Q. Okay. And was it his decision to plead guilty to this charge?

A. It – it's — I explained to him that it wasn't a guarantee, but he understood that he would probably get probation, but he knew that he could not. We talked about the range of punishment and that, too.

Q. All right. And did he want to go forward with a plea?

A. Yes, he wanted to go forward with the plea.

Q. All right. And did you explain to him that his options were going forward with the plea or taking the case to trial?

A. I -- told him his -- with the complainant, his better options would be with the PSI.

Q. Did you tell him what his legal options were at the time that you were going over the plea with him, that he had the option of either pleading guilty to the case or setting the case for trial?

A. Yes, we discussed that.

Q. And which did he choose to do?

A. After my explanation, he wanted to go forward with the PSI.

. . .

Q. Did you also have the discussion with him about whether or not he wanted to testify during his Presentence Investigation hearing?

A. We talked and I told him he needed to testify.

Q. And did he agree with you that he would testify?

A. He agreed that he would testify.

Q. And at any time did you feel that he didn't understand what he was agreeing to by testifying?

A. No, I thought he -- I thought we were all on one page.

Appellant points to his low IQ test scores. Appellant's juvenile records revealed that approximately eight years before the case commenced, appellant, at the age of sixteen, was professionally assessed as "a young man with limited intellectual capacities" having the verbal abilities of a first- or second-grader, and scored an intelligence quotient (IQ) of 84, or "low average." These earlier scores (outside the context of litigation) bear credibility that subsequent IQ scores may lack. Even presuming the validity of the lower IQ score of 61 mentioned in Dr. Hamlin's report, Dr. Hamlin stated that appellant's overall level of functioning was still "adequate to engage counsel in a reasonable and rational manner." And, bearing in mind that Dr. Hamlin added that appellant's limited verbal abilities "would necessitate assistance with any written materials, simplified explanations, and frequent checks for clarity," we have found nothing in the record that suggests that appellant lost the ability to understand the proceedings or to confer rationally with his counsel. Instead, as described in more detail in the next section, the record contains evidence that trial counsel's interactions accommodated appellant's limitations, just as the expert suggested. We conclude that the trial court did not err in impliedly determining that appellant did not meet his burden of proving a reasonable probability that the fact-finder would have found him incompetent to stand trial had there been a competency hearing. *See Ex parte LaHood*, 401 S.W.3d at 54. Thus, we overrule appellant's second issue.

**B. Evidence supports a finding that appellant's trial counsel (and the trial court) took steps to ensure a knowing and voluntary plea, and that the plea was not obtained by misrepresentations.**

In his third issue, appellant complains his counsel was ineffective (1) because counsel did not communicate with appellant about the "guilty" plea in a way appellant could understand, and (2) because counsel gave misleading advice

13

about appellant's chances of probation. Appellant asserts that this conduct resulted in an involuntary "guilty" plea. We first consider whether the trial court erred by impliedly concluding that appellant did not meet his burden of proving the challenged conduct under the first of these two ineffective-assistance theories.

### 1. The challenged conduct under the first theory

Under his first theory appellant asserts that his trial counsel failed to communicate with appellant about the "guilty" plea in a way appellant could understand because counsel did not provide simplified explanations of legal information and failed to tailor his communications to appellant's disability. Appellant relies upon Dr. Hamlin's statement that appellant's capacity to engage with counsel in a reasonable and rational manner requires "assistance with any written materials, simplified explanations, and frequent checks for clarity." We presume, without deciding, that prevailing professional norms required appellant's counsel to communicate with appellant about the "guilty" plea in a way appellant could understand, provide simplified explanations of legal information, and to tailor counsel's communications to appellant's disability.

In his affidavit appellant's trial counsel testified that he did not make accommodations because he was unaware of any mental or intellectual deficiency until appellant took the stand at the punishment hearing. But the court was free to discredit that evidence, and instead credit counsel's testimony at the motion-for-new-trial hearing and other evidence to the contrary.[2]

At the motion-for-new-trial hearing trial counsel testified that he had known appellant was "slow" and that appellant had been enrolled in special education

---

[2] At the punishment hearing, trial counsel predicated a question to the complainant with a reference to a discussion he had with her about appellant's intellectual deficiencies before appellant's plea.

14

classes in school. He further testified that at the time of the plea, he believed that appellant understood the plea documents, the nature of the proceedings, and consequences of the plea and sentencing. Appellant's counsel explained that he and appellant "took [their] time" with the plea paper work, without rushing. Trial counsel recalled that appellant frequently confirmed the material was clear by reference to appellant's nodding as the two continued through the paperwork. Counsel testified that he explained the proceedings, the sentencing process, the punishment range, and possible outcomes.

Under the applicable standard of review, we conclude that the trial court did not abuse its discretion by impliedly concluding that appellant did not meet his burden of proving that his trial counsel failed to communicate with him about the "guilty" plea in a way appellant could understand, that counsel failed to provide simplified explanations of legal information, or that counsel failed to tailor his communications to appellant's disability. *See Burch*, 541 S.W.3d at 821; *Rivera v. State*, 981 S.W.2d 336, 340 (Tex. App.—Houston [14th Dist.] 1998, no pet.). Accordingly, we conclude that the trial court did not err in denying the motion for new trial as to the first theory under the third issue. *See Burch*, 541 S.W.3d at 821; *Rivera*, 981 S.W.2d at 340.

### 2. Prejudice under each theory

In the alternative, we presume for the sake of argument that appellant's trial counsel failed to communicate with him about the "guilty" plea in a way appellant could understand, that counsel failed to provide simplified explanations of legal information regarding the plea, and that counsel failed to tailor his communications regarding the plea to appellant's disability. In addition, we presume, without deciding, that appellant's trial counsel gave appellant misleading advice about appellant's chances of probation and that counsel's advice to appellant regarding

15

the "guilty" plea fell below an objective standard of reasonableness. Even under these presumptions, appellant still had the burden of proving prejudice from one or more of these acts or omissions. *See Lee*, —U.S. at —, 137 S.Ct. at 1964; *Miller*, 548 S.W.3d at 499.

To have a court set aside a defendant's "guilty" plea as involuntary based on the deficient performance of the defendant's trial counsel in advising the defendant regarding the "guilty" plea, the defendant must prove a reasonable probability that, but for trial counsel's deficient performance, the defendant would not have pleaded "guilty." *See Lee*, —U.S. at —, 137 S.Ct. at 1965; *Miller*, 548 S.W.3d at 499–500; *Cano v. State*, 361 S.W.3d 252, 255 n.3 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Neither in his motion for new trial nor in his appellate briefing has appellant asserted that but for his trial counsel's allegedly deficient performance, appellant would not have pleaded "guilty." No evidence before the trial court directly addresses this issue. In his affidavit, appellant states that he now wishes he had not pleaded "guilty." This statement is not the same as saying that but for his trial counsel's deficient performance, appellant would not have pleaded "guilty." In any event, the trial court reasonably could have disbelieved any of appellant's testimony that supports the granting of a new trial. *See Clarke v. State*, 305 S.W.3d 841, 848 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd).

Our dissenting colleague concludes that there is a reasonable probability that, but for trial counsel's deficient performance, appellant would not have pleaded "guilty." *See* post at 7. Our colleague bases this conclusion on appellant's testimony that his lawyer told him to plead "guilty," his lawyer said appellant would get probation, and now appellant wishes that he had not pleaded "guilty." *See id*. Though appellant expresses regret at having pled "guilty," appellant has not stated that but for his trial counsel's allegedly deficient performance, appellant would not have pleaded "guilty." Even if appellant had so testified, the trial court

16

reasonably could have disbelieved that testimony. *See Clarke*, 305 S.W.3d at 848. Our dissenting colleague fails to take into account that this court is reviewing the trial court's denial of appellant's motion for new trial based on ineffective assistance of counsel rather than examining such a claim for the first time on appeal. *See* post at 6–7.

Under the applicable standard of review, we conclude that the trial court did not err by impliedly concluding that appellant did not meet his burden of proving a reasonable probability that, but for his trial counsel's deficient performance, appellant would not have pleaded "guilty." *See Miller*, 548 S.W.3d at 499–500; *Cano*, 361 S.W.3d at 255 n.3; *Clarke*, 305 S.W.3d at 848.

For the foregoing reasons, we overrule appellant's second issue.

## C. Appellant's trial counsel presented mitigating evidence regarding mental health at the punishment hearing.

In his fourth issue, appellant complains that his trial counsel failed to present mitigating evidence at the punishment hearing regarding appellant's mental-health status. Appellant asserts that his counsel failed to investigate his mental-health issues and that this failure to investigate resulted in a failure to present mitigating evidence regarding appellant's mental health during the punishment hearing.

To the extent appellant argues that his trial counsel presented no mitigating evidence as to mental health, the trial court reasonably could have concluded the opposite. In fact, appellant's trial counsel made appellant's mental health and intellectual limitations a central theme at the punishment hearing and wove these elements into his presentation:

- Counsel explained that, despite appellant's "bipolar issues" and enrollment in "special classes" in school years, appellant had never received any type of counseling or treatment after he went to high school.

17

- Trial counsel offered as exhibits three letters of recommendation in support of appellant. The letters attribute appellant's mental health to be the source of appellant's past behavior and attribute mental health treatment as the key solution. The letters state that appellant was usually mild tempered but just needed counseling to exercise self-control, and that appellant is in the process of receiving medication to control his mental health problems.

- Appellant's counsel elicited favorable testimony from the complainant about appellant's mental deficiencies and school performance; she stated, "He wasn't always in a classroom setting with the regular children, he was always in one room his whole time of going to school all the way to high school."

- Counsel called appellant's friend to testify that appellant generally has a good character, and that appellant would benefit significantly from professional counseling to assist him with his anger-management issues. In response to appellant's trial counsel's question about "his slowness with respect to his schooling and education," the friend explained that he knew appellant was "a little bit off track."

- Counsel called appellant, who discussed his cognitive deficiencies and troubles in school, particularly with reading and writing, and that appellant never received the counseling or treatment that he needs to learn to cope with his anger-management and impulsivity issues.

During closing argument at the punishment hearing, appellant's trial counsel stated that he learned appellant was illiterate during his testimony, and counsel emphasized the lack of prior treatment, stating:

I think he tries to hide or to avoid letting people know that he does have a problem reading, understanding, and it all came out today. He basically has some very low intellectual skills that is certainly contributing to his problem. I think he is young enough, even though he has a history, I think he is young enough to benefit from what our probation and rehabilitation perhaps can do for him.

To the extent appellant complains that his trial counsel presented no mitigating evidence as to mental health, the trial court reasonably could have concluded that appellant's trial counsel did present such evidence. To the extent appellant asserts that appellant's counsel should have investigated appellant's mental health and that an investigation would have uncovered more mitigating evidence, appellant had the burden to prove what would have been discovered. *See Stokes v. State*, 298 S.W.3d 428, 432 (Tex. App.—Houston [14th] 2009, no pet.). A claim for ineffective assistance based on trial counsel's failure to investigate the facts of the case fails absent a showing of what the investigation would have revealed that reasonably could have changed the result of the case. *See Cooks v. State*, 240 S.W.3d 906, 912 (Tex. Crim. App. 2007); *Stokes v. State*, 298 S.W.3d 428, 432 (Tex. App.—Houston [14th] 2009, no pet.). In his motion for new trial, appellant generally alleged that trial counsel "failed to properly investigate or prepare for the PSI hearing," but appellant made no contention regarding a failure to mitigate.

Although appellant attached to the motion an excerpt from mental-health records that appellant's appellate counsel obtained from the Harris County Juvenile Probation Department (and highlighted that these documents indicate appellant had a reading ability at a second-grade level, a spelling ability at a first-grade level, and an IQ of 84), appellant did not assert then (nor does he assert on appeal) that this evidence, if admitted during the punishment hearing, would have changed the result in this case. Only in closing argument, did appellant's appellate counsel argue that Dr. Hamlin's opinions (that appellant's limited verbal abilities and first-grade reading level would necessitate assistance with written materials, simplified explanations, and frequent checks for clarity) "would have been extremely important for the court to assess a proper sentence." Even in his brief on appeal appellant fails to specify what the investigation would have revealed that could

19

have changed the outcome.

Even if we presume appellant contends that appellant's juvenile records and Dr. Hamlin's opinions should have been offered as mitigating evidence and that appellant contends this evidence would have changed the outcome, the trial court reasonably could have determined that appellant had not shown a reasonable likelihood that the outcome of the punishment hearing would have been different if counsel had submitted these materials to the trial court. *See Stokes*, 298 S.W.3d at 432.

Appellant contends that the facts of this case are analogous to those in *Lopez v. State* and *Lampkin v. State*, decisions in which sister courts found prejudicial ineffective assistance rendered at the punishment stage flowing from a failure to investigate mental health.

In *Lopez*, after first attempting to withdraw from the case on the eve of trial, defense trial counsel presented virtually no evidence of mitigating factors to balance against the strong aggravating factors. *Lopez v. State*, 462 S.W.3d 180, 189 (Tex. App.—Houston [1st Dist.] 2015, no pet.). The only evidence counsel presented was a "one-sentence statement to the trial court that his client wanted the court to know that he considered himself to be a good role model." *Id.* In *Lampkin v. State*, the Sixth Court of Appeals found ineffective assistance where "trial counsel performed no investigation into any possible mental health or other mitigating factors, and he presented no mitigating evidence for the jury to balance against the aggravating factors presented by the State." 470 S.W.3d 876, 925–26 (Tex. App.—Texarkana 2015, pet. ref'd). The defendant in *Lampkin* had undergone significant mental-health treatment while incarcerated previously and while awaiting trial, appellate counsel presented over thirty entries from mental-health records, which contained "the only possible mitigating evidence,

20

demonstrated that Lamkin had been homeless and impoverished, had diminished capacity, suffered from psychotic delusions and major depressive disorder, had attempted suicide, and had a long history of drug abuse." *Id.* at 924. The *Lampkin* court considered this to be evidence that revealed "the kind of troubled history. . . relevant to assessing defendant's moral culpability.'" *Id.*, *citing Wiggins v. Smith*, 539 U.S. 510, 535, 123 S. Ct. 2527, 2542, 156 L. Ed. 2d 471 (2003).

Appellant's trial counsel's efforts at the punishment hearing are not comparable to those of the attorney in *Lopez*. *See Lopez*, 462 S.W.3d at 189. And, in *Lampkin* the undiscovered mental-health records were the only available source of evidence of the defendant's troubled history. The facts in today's case include evidence of appellant's troubled history, elicited from witnesses by trial counsel. This evidence was also included in the PSI report. To the extent appellant's juvenile records contain some details about his past, most of the same details also appear in the PSI report. The *Lampkin* and *Lopez* cases are not on point. *See Lampkin*, 470 S.W.3d at 925–26; *Lopez*, 462 S.W.3d at 189.

For the foregoing reasons, we overrule the fourth issue.

**D. Appellant has not established the ineffective-assistance complaints raised for the first time on appeal under his fifth issue.**

In his fifth issue, appellant complains for the first time on appeal that his trial counsel was ineffective for (1) failing to prepare appellant to testify at the punishment hearing, (2) simply telling him he needed to take the stand, and (3) failing to advise him that he would be subject to unfavorable scrutiny.

Appellant did not raise these complaints in the trial court; so, the trial court did not rule on these issues. The hearing record on appellant's motion for new trial contains evidence that appellant agreed to take the stand following his counsel's suggestion that it was necessary to do so. The record also contains evidence that

appellant and his counsel discussed topics of the testimony and that appellant wanted to testify about his desire to obtain anger-management treatment. Nothing in the record shows whether appellant was counseled about being subject to unfavorable scrutiny; appellant's trial counsel was not asked about this topic at the motion-for-new-trial hearing. As to this alleged conduct, we conclude that appellant has not established (1) that trial counsel engaged in this conduct, or (2) that in doing so, counsel's representation fell below an objective standard of reasonableness based on prevailing professional norms, or (3) that there is a reasonable probability that the result of the punishment hearing would have been different but for trial counsel's deficient performance. *See Thompson v. State*, 94 S.W.3d 11, 21–22 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd).

Accordingly, we overrule appellant's fifth issue.

## E. The trial court did not err in impliedly concluding appellant did not prove prejudice from trial counsel's failure to investigate appellant's intellectual capacity.

Under his first issue, appellant complains that trial counsel was ineffective for failing to investigate (or cutting short his investigation) as to appellant's mental capacity. A criminal-defense lawyer "has a duty to make reasonable investigations or to make reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "[S]trategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," while "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91. In addition to proving that trial counsel's representation fell below an objective standard of reasonableness based on counsel's alleged breach of this duty to investigate, appellant also had to show a reasonable probability that, but for counsel's breach

22

of this duty, the result of the proceeding would have been different. *Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010).

Appellant's trial counsel stated that he knew that appellant was "slow," and testified that appellant's mother indicated to him that appellant had been in "special classes," and received some mental-health treatment during his school years. Counsel was told appellant had received no treatment since then. Counsel asked appellant's mother and the complainant to obtain mental-health documents. Trial counsel did not subpoena the school records and confirmed that he made no effort to contact the school. Counsel testified that appellant's mother had assured him that she had gone to the school "to talk to the teachers at the high school," and she "said they just no longer had those records." Appellant's trial counsel's testimony reflects that based on his discussion with appellant's mother, he formed the belief that no other records pertaining to appellant's mental health during appellant's school years were obtainable and therefore counsel ceased further efforts. We presume, for the sake of argument, that appellant's trial counsel failed to investigate appellant's intellectual capacity and that this failure to investigate fell below an objective standard of reasonableness, based on prevailing professional norms.

Appellant had the burden to prove what would have been discovered if his trial counsel had conducted a reasonable investigation of appellant's intellectual capacity. *See Stokes*, 298 S.W.3d at 432. A claim for ineffective assistance based on trial counsel's failure to investigate the facts of the case fails absent a showing of what the investigation would have revealed that reasonably could have changed the outcome of the case. *See Cooks*, 240 S.W.3d at 912; *Stokes*, 298 S.W.3d at 432.

Appellant does not provide a clear statement in his appellate brief of what he

23

alleges as the harm from trial counsel's allegedly deficient performance under the first issue, but appellant suggests that this failure to investigate led to all of the other complaints he set forth in his brief. Appellant only offered proof of records from the Harris County Juvenile Probation Department and Dr. Hamlin's psychological evaluation report, and the trial court reasonably could have determined that appellant did not show a reasonable likelihood that the result of the proceeding would have been different at any stage of the case if counsel had discovered these materials or documents similar to them as part of counsel's investigation. *See Stokes*, 298 S.W.3d at 432. In addition, we have overruled all of appellant's other issues. Accordingly, we overrule the first issue.

Having overruled all of appellant's issues, we affirm the trial court's judgment.


/s/    Kem Thompson Frost
Chief Justice

Panel consists of Chief Justice Frost and Justices Zimmerer and Hassan (Hassan, J., dissenting).

Publish — TEX. R. APP. P. 47.2(b).